1  WO

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6                 FOR THE DISTRICT OF ARIZONA

7

8  David Gulbrandson,                )
                                     )        CV-98-2024-PHX-SMM
9              Petitioner,           )
                                     )
10  v.                               )
                                     )        **MEMORANDUM OF DECISION**
11                                   )        **AND ORDER**
   Dora Schriro, et al.,[1]          )
12                                   )
              Respondents.           )
13                                   )
                                     )
14  _____    )

15          Petitioner David Gulbrandson filed a Petition for Writ of Habeas Corpus alleging that

16  he is imprisoned and sentenced to death in violation of the United States Constitution. (Dkt.

17  1.)[2] His amended petition presented twenty-seven claims. (Dkt. 27.) The Court addressed

18  the procedural status of the claims in an Order dated August 30, 2000. (Dkt. 46.) The Court

19  found that Claim 2 was not cognizable and that Claims 6, 10, 12(A), 14, 15, 16, 17, 19, 20,

20  24, and 27 were procedurally barred. (*Id.*) This Order considers the merits of the remaining

21  claims: Claims 1, 3, 4, 5, 7, 8, 9, 11, 12(B) through 12(G), 13, 18, 21, 22, 23, 25, and 26. For

22  the reasons set forth herein, the Court finds that Petitioner is not entitled to habeas relief.

23                              **BACKGROUND**

24  _____

25          [1]      Dora Schriro, Director of the Arizona Department of Corrections, is substituted
   pursuant to Fed. R. Civ. P. 25(d)(1).
26

27          [2]      "Dkt." refers to documents in this court's file. "ROA" refers to the state court
   record on appeal (CR-93-0085-AP). "RT" refers to the reporter's transcripts. "ME" refers
28  to minute entries of the state court. "ROA-PCR" refers to records from the post-conviction
   proceedings in state court (CR-98-0248-PC).

Petitioner and the victim, Irene Katuran, were partners in a photography business.[3] They were also romantically involved.  The personal relationship ended in January 1991, when Ms. Katuran renewed a romantic relationship with another man, but the business partnership continued.

On February 14, 1991, an intoxicated Petitioner argued with Ms. Katuran about the business in the presence of two friends, Sally and Charles Maio.  Petitioner then physically attacked Ms. Katuran and began choking her; when Mr. Maio pulled Petitioner off Ms. Katuran, Petitioner attacked her again.  As the Maios drove Petitioner home, he stated, "I'm going to kill her [Irene].  I'm going to kill the business.  I'm going to kill everything."  Ms. Katuran obtained a restraining order against Petitioner.  When served with the order on February 27, 1991, Petitioner referred to Ms. Katuran as a "bitch."

During the weekend of March 8, 1991, Ms. Katuran traveled to New Mexico on business.  She returned on the evening of Sunday, March 10, with cash and checks from the trip.  The next morning, Monday, March 11, her daughter went to Ms. Katuran's bedroom to wake her and found the bedroom door locked; there was no response when she knocked.  She then noticed a dark stain on the wall leading to her mother's bedroom.  Suspecting that something was amiss, the daughter telephoned her grandmother, who then called the police.

The police found Ms. Katuran dead in the bathroom adjacent to her bedroom.  The Arizona Supreme Court described the murder scene:

> Irene was killed brutally.  The police found her face down dressed in only a pair of panties with her legs bent up behind her at the knee and her ankles tied together by an electrical cord attached to a curling iron.  Her right wrist was bound with an electrical cord attached to a hair dryer.  Her bedroom was covered in what appeared to be blood.  From the bedroom to the bathroom were what appeared to be drag marks in blood. Clumps of her hair were in the bedroom; some of the hair had been cut, some burned, and some pulled out by

---

[3]  Except where otherwise indicated, the following factual summary is taken from the decision of the Arizona Supreme Court in *State v. Gulbrandson*, 184 Ariz. 46, 906 P.2d 579 (1995).

the roots.

Four knives and a pair of scissors were in the kitchen sink and appeared to have blood on them; hair appeared to be on at least one of the knives. There also was what appeared to be blood on a paper towel holder in the kitchen; a burnt paper towel was in Irene's bedroom. A Coke can with what appeared to be a bloody fingerprint on it was on the kitchen counter; this fingerprint was later identified as defendant's. At trial, the state's criminalist testified that the knives, scissors, paper towel holder, and Coke can had human blood on them, although the police did not determine the blood type. Defendant's fingerprints were found on the paper towel holder and on an arcadia door at Irene's home, which was open in the family room the morning after the crime. A blood-soaked night shirt with holes in it was in Irene's bedroom; the blood on the nightshirt was consistent with Irene's blood type. A banker's bag was also in her bedroom with what appeared to be blood on it.

The autopsy revealed that Irene suffered at least 34 sharp-force injuries (stab wounds and slicing wounds), puncture wounds, and many blunt force injuries. The most serious stab wound punctured her liver, which alone was a fatal injury. Her nose was broken, as were 2 ribs on the back of the chest and 5 ribs in front on the same side of her trunk. The tine from a wooden salad fork was embedded in her leg; a broken wooden fork was found in the bedroom. On her left buttock was an abrasion that appeared to be from the heel of a shoe. The thyroid cartilage in front of her neck was fractured, which could have been caused by squeezing or by impact with a blunt object. She died from the multiple stab wounds and the blunt neck injury. The neck injury may have resulted in asphyxiation. The pathologist believed that most, if not all, of the injuries were inflicted before death.

*State v. Gulbrandson*, 184 Ariz. 46, 53-54, 906 P.2d 579, 586-87 (1995). Ms. Katuran's car was also missing.

The police immediately suspected Petitioner. Officers searched his apartment on March 11. They discovered blood-splattered papers, a blood-stained jacket, and other black clothing with blood stains. They also located checks from New Mexico, payable to the photography business, and other business papers. In the pocket of the black jacket they found a credit card belonging to Ms. Katuran.

On the evening of March 11, Petitioner called his mother and told her that "he thought he had done a terrible thing. He thought he had killed Irene." He also indicated that he was going to kill himself. Petitioner's mother called the police and informed them of the conversation.

After the murder, Petitioner drove Ms. Katuran's car to Laughlin, Nevada, where he

was observed gambling at a hotel casino in the early morning hours of Tuesday, March 12. He told casino employees that his name was David Wood.  He lost between $1,100 and $1,200; management provided him with a complimentary room.

Petitioner then traveled to Montana, where, using the name David Randall, he attempted to sell Ms. Katuran's car to a bar owner, who declined the deal because Petitioner could not produce a title to the car.  On April 1, 1991, a Montana police officer discovered the vehicle, which was damaged and had been abandoned on the road.  The vehicle bore Canadian license plates; the Arizona plate was found under the driver's seat.  The police apprehended Petitioner in an apartment in Great Falls, Montana, on April 3, 1991.

On December 15, 1992, a jury convicted Petitioner of theft and first-degree premeditated murder.  The trial court sentenced Petitioner to death on the murder conviction. On direct appeal, the Arizona Supreme Court affirmed the conviction and sentence. *Gulbrandson*, 184 Ariz. 46, 906 P.2d 579.  The United States Supreme Court denied certiorari. *Gulbrandson v. Arizona*, 518 U.S. 1022 (1996).

In April 1997, Petitioner filed a petition for post-conviction relief ("PCR") pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.  (ROA-PCR 256.)  The PCR court denied relief on January 5, 1998, without holding an evidentiary hearing.  (ME 1/5/98.)  On October 20, 1998, the Arizona Supreme Court denied review.

Petitioner filed a Petition for Writ of Habeas Corpus in this Court on November 6, 1998, and an amended petition on May 13, 1999.  He filed his brief on the merits of the properly exhausted claims on January 26, 2001.  (Dkt. 62.)   Respondents filed a response (Dkt. 70), and Petitioner filed a reply (Dkt. 80).

**AEDPA STANDARD FOR RELIEF**

Because his habeas petition was filed after April 24, 1996, Petitioner's claims are governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

- 4 -

For properly preserved claims "adjudicated on the merits" by a state court, the AEDPA enacted a more rigorous standard for habeas relief. *See Miller-El v. Cockrell (Miller-El I)*, 537 U.S. 322, 337 (2003); *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004). Under the AEDPA, therefore, a petitioner is not entitled to habeas relief on any claim unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d at 969. The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529

U.S. at 381.  Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Williams*, 529 U.S. at 407.  In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable."  *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts.  *Miller-El v.*

- 6 -

*Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340; *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law.  *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision.  *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## DISCUSSION

**Claim 1:      "Death Qualification" of Jurors**

Petitioner asserts that the trial court improperly "death qualified" prospective jurors in violation of his rights to due process and equal protection and his rights under the Sixth, Eighth, and Fourteenth Amendments.  (Dkt. 62 at 14-16.)  Petitioner contends that the death-qualification process violated his rights because in Arizona at the time of his conviction the

judge, not the jury, determined a capital defendant's sentence and therefore the State had no legitimate interest in obtaining a death-qualified jury. The Arizona Supreme Court rejected this claim on direct appeal, finding that death-qualification of the jurors did not constitute fundamental error. *Gulbrandson*, 184 Ariz. at 57, 906 P.2d at 590.[4]

Clearly established federal law holds that the death-qualification process in a capital case does not violate a defendant's right to a fair and impartial jury. *See Lockhart v. McCree,* 476 U.S. 162, 178 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980); *see also Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (death qualification of Arizona jurors not inappropriate). As Petitioner acknowledges, the "United States Supreme Court has not yet squarely decided this issue as it relates to states in which the sole responsibility for punishment lies with the judge." (Dkt. 62 at 14.) Because Petitioner's position is not supported by clearly established federal law, in the form of United States Supreme Court precedent, the decision of the Arizona Supreme Court denying the claim cannot form the basis for federal habeas relief. *See Williams*, 529 U.S. at 365; *Carey v. Musladin*, 127 S. Ct. at 653-54 (denying habeas relief in absence of clearly established federal law). Claim 1 is therefore denied.

**Claim 3:       Preclusion of Mental Health Expert's Testimony**

Petitioner asserts the trial court improperly precluded the testimony of a mental health expert concerning Petitioner's state of mind at the time of the murder in violation of his rights under the Sixth and Fourteenth Amendments. (Dkt. 62 at 16-17.) The Arizona

---

[4]       In rejecting this claim, the supreme court relied on its own precedent, citing *State v. Schaaf*, 169 Ariz. 323, 331, 819 P.2d 909, 917 (1991), where the court explained that "[e]ven though the jurors do not make sentencing decisions, death-qualifying of jurors during voir dire is appropriate 'to determine whether those views would prevent or substantially impair the performance of the juror's duties to decide the case in accordance with the court's instructions and the juror's oath'" (interior quotation omitted). *Gulbrandson*, 184 Ariz. at 57, 906 P.2d at 590.

Supreme Court did not reach the issue because trial counsel failed to preserve it for appeal.[5]
*Gulbrandson*, 184 Ariz. at 59, 906 P.2d at 592.  Because the state court did not address this claim on the merits, this Court's review is de novo.  *See Pirtle*, 313 F.3d at 1167.

Background

Prior to trial, defense counsel Douglas Harmon requested a Rule 11 competency examination.  (ROA 50.)  The court denied the motion after a pre-screening psychological evaluation of Petitioner concluded that a full Rule 11 examination was not warranted.  (See Dkt. 47.)  Petitioner, now represented by Lyle Spillman, filed a motion seeking authorization for a CAT scan.  (ROA 75.)  The trial court granted the motion.  (ROA 79.)

At trial, Spillman presented an insanity defense and challenged the element of premeditation.  The State moved to limit the testimony of Petitioner's mental health expert, psychiatrist Martin Blinder.  (ROA 77.) The State argued that Dr. Blinder's testimony should be limited to a discussion of Petitioner's general personality traits, and that he should not be allowed to testify regarding Petitioner's mental state at the time of the offense.  (*Id.*)  The trial court ruled that if Petitioner presented testimony indicating that he was insane under *M'Naghten* at the time of the murder, then testimony about character traits indicating an inability to form specific intent at the time of the offense would be admissible.[6]  (ME 11/25/92.)  Otherwise, the court explained, such evidence would be limited to Petitioner's

---

[5]      Although the Arizona Supreme Court did not reach the legal merits of Petitioner's challenge to the trial court's preclusion of evidence regarding his mental state at the time of the murder, the court did observe "that there was overwhelming evidence of premeditation and that the trial court gave Dr. Blinder wide latitude to testify generally about defendant's mental condition."  *Gulbrandson*, 184 Ariz. at 59, 906 P.2d at 592.

[6]      The so-called *M'Naghten* test for insanity, as provided in former A.R.S. § 13-502(A), asks whether the defendant, at the time he committed the act, "was suffering from such a mental disease or defect as not to know the nature and quality of the act" or, in the alternative, whether the defendant "did not know that what he was doing was wrong."  A defendant must prove insanity by clear and convincing evidence.

1    general tendencies, and expert testimony concerning his mental state at the time of the

2    offense would be precluded.  (*Id.*)

3        At trial, counsel focused his defense on Petitioner's mental condition.  He presented

4    the testimony of Petitioner's sisters, both of whom had professional experience working with

5    the mentally ill.  The sisters testified that in their opinion Petitioner was insane at the time

6    of the murder.  (RT 12/10/92 at 74, 93-94.)  They further testified that as a child Petitioner

7    had been violently abused by their alcoholic father (*id.* at 64, 83-85), and that on several

8    occasions Petitioner had received treatment, including hospitalization, for mental health

9    issues and alcoholism (*id.* at 72-73, 86-87).  Petitioner's mother confirmed these details of

10   Petitioner's background, testifying that Petitioner was terrified of his father, who struck him,

11   pushed his face into plates of food, and dragged him by his hair; the abuse occurred on at

12   least a weekly basis beginning before Petitioner was five and ending when he was twelve and

13   his parents divorced.  (RT 12/2/92 at 33-35.)  His mother also provided additional details

14   concerning Petitioner's history of mental health problems and treatments.  (*Id.* at 35-40).

15   Finally, she testified that Petitioner was under great stress around the time of the murder and

16   that she had been trying to get him some type of mental treatment, even traveling to Phoenix

17   from the family's home state of Wisconsin to aid Petitioner and make arrangements for

18   treatment.  (*Id.* at 30-32, 40-41.)

19       Counsel also presented extensive testimony from Dr. Blinder, who had examined

20   Petitioner, interviewed his family members, reviewed some medical records, and prepared

21   a report.[7]  At trial, Dr. Blinder testified about Petitioner's abusive childhood and its effects

22

23

24       [7]     Dr. Blinder reviewed records from Petitioner's "most recent hospitalization,"
     at St. Michael's Hospital, in Milwaukee, but not the records of previous treatments, at the
25   DePaul Hospital, the Marshfield Clinic, and the Milwaukee County Hospital.  (RT 12/10/92
     at 57.)  The dates of these previous treatments range from 1967-1984.  (*See* RT 12/7/92 at
26   35-36; RT 12/10/92 at 109.)  When asked on cross-examination if a review of the prior
     records would have affected his diagnoses, Dr. Blinder testified that, "I would be less
27   confident in the details of my conclusion, but I think my conclusions would remain the same

28

on his present psychological condition; his past mental health treatment, including hospitalizations; and prior episodes involving reported disassociation and stress-related violence. (RT 12/10/92 at 15-25.) Dr. Blinder testified that he diagnosed Petitioner with four conditions: dissociative episode and possible fugue state; bipolar disorder; alcoholism; and personality disorder, primarily narcissistic with antisocial traits. (*Id.* at 25.) Dr. Blinder explained that Petitioner suffered from "mental disability." (*Id.* at 28.) According to Dr. Blinder, this "life long" disability was "sporadically crippling" and "tremendously" impaired Petitioner's ability to deal with stressful situations. (*Id.* at 28-29.)

Because Dr. Blinder did not opine that Petitioner met the legal definition of insanity under *M'Naghten*, the trial court refused to allow him to testify about Petitioner's mental state at the time of the crime. (ME 11/25/92.) Nonetheless, Dr. Blinder was able to offer a broad range of testimony about Petitioner's mental condition, including its effect on his behavior at the time of the murder.

For example, although the trial court sustained the State's objections to some questions that elicited a response from Dr. Blinder regarding Petitioner's mental condition at the time he committed the crime, the court did allow Dr. Blinder to testify extensively about Petitioner's personality traits and how these might affect his ability to premeditate. Most significantly, Dr. Blinder was able to opine about Petitioner's reaction to a so-called "hypothetical" situation indistinguishable from Petitioner's version of the circumstances surrounding Ms. Katuran's murder. (*Id.* at 29.) Thus, defense counsel inquired of Dr. Blinder, "What would you expect his reaction might be in a situation where he was under a high degree of stress and there was a quarrel or argument and an object was thrown at him? Would he reflect on what he should do, or think about it, or would he act reflexively in your opinion." (*Id.*) Dr. Blinder replied:

and would still reach the threshold of reasonable and medical probability." (RT 12/10/92 at 58.)

> Well, my answer to your question does not cover every hypothetical that was implied in your question, but certainly there are times and, indeed, looking into his history I can even point to some specific times where confronted with that sort of provocation, and what he would experience as a provocation, particularly if occurring at a time when he feels wiped out, devastated, without any resort, that he dissassociates, goes out of control, loses his ability to think rationally, just acts in a violent fashion.  Tune out consciousness and operate like a robot, a violent out-of-control robot.

(*Id.* at 29-30.)

Trial counsel continued: "So, it would be your testimony that in such a situation it would be likely that he would not be able to calculate or plan what he was going to do, that he would just act without thinking?"  (*Id.* at 30.)  Dr. Blinder concurred:

> Yeah. It would be very difficult for this man to calculate the plan.  This is not his strong suit under the best of circumstances.  But certainly when this dissociative mechanism is triggered, it would be very difficult for him to act in a constructive rationale [sic] planned manner.

(*Id.*)

Despite the court's ruling and the State's objections, trial counsel elicited further testimony from Dr. Blinder concerning Petitioner's state of mind at the time of the murder. Dr. Blinder testified that the evidence left behind by Petitioner at the murder scene and in Petitioner's apartment – the Coke can with his bloody fingerprint and the bloody clothing – supported a finding that Petitioner, in carrying out the murder, was not "capable of a moment of thought about what he had done" and did not act as "a person who is thinking or planning something of this sort would."  (*Id.* at 31.)  Dr. Blinder also testified that the gratuitous violence inflicted on Ms. Katuran indicated that Petitioner was "out of control."  (*Id.* at 34.) Finally, Dr. Blinder explained that neither the binding of Ms. Katuran, which was accomplished with materials found at the scene, nor Petitioner's actions in the days following the crime, suggested that the murder was premeditated.  (*Id.* at 34-38.)

Counsel's examination of Dr. Blinder concluded with additional questions concerning a scenario in which Petitioner's personality traits were combined with "profound unremitting narcissistic injury" (in the form of the deteriorating personal and business relationships with

Ms. Katuran) and physical provocation by the victim (throwing a scissors at Petitioner). (*Id.* at 41-43.) According to Dr. Blinder, given these hypothetical circumstances, gratuitous violence "might result reflexively rather than with any thought process." (*Id.* at 42-43.)

In rebuttal, the state called psychiatrists Alexander Don and John Scialli, both of whom evaluated Petitioner and prepared reports.[8] Dr. Don testified that Petitioner told him that the last memory he had before Ms. Katuran's murder was going to her home that night to get a key to his apartment because he had locked himself out. (RT 12/7/92 at 13-14.) Petitioner told Dr. Don that he recalled talking to the victim in the kitchen, where she threw a pair of scissors at him; according to Petitioner, the next thing he remembered was driving through Wickenburg and then to Laughlin. (*Id.*) Petitioner said he saw a report about the murder on television and only then came to believe that he had committed the crime. (*Id.* at 15.)

Dr. Don testified that in his opinion Petitioner was not *M'Naghten* insane at the time of the killing; i.e., he found "no indications that [Petitioner] suffered with a mental illness or defect at the time of the commission of the crime" and that there was "no reason to doubt that his awareness of what he was doing and the wrongfulness of what he was doing was unimpaired." (*Id.* at 23-24.) Further, Dr. Don testified that a person's ability to remember an incident is unrelated to that person's knowledge regarding what he was doing at the time of the incident. (*Id.* at 29-30.)

Dr. Scialli, who was initially retained by the defense team, also testified that in his opinion Petitioner was legally sane at the time of the alleged offense because he knew the nature and quality of his acts and knew the difference between right and wrong. (12/10/92 at 115-16.) In addition, Dr. Scialli testified that the results of the court-ordered CAT scan,

---

[8] At the time of his trial testimony, Dr. Don had not been provided with the records from Petitioner's prior treatments; he testified, however, that the records were not necessary for him to render his opinion. (RT 12/7/92 at 33-23.) Dr. Scialli, by contrast, reviewed all of Petitioner's past medical records. (RT 12/10/92 at 108-10.)

performed on November 5, 1992, were normal, indicating no neurological or brain impairment. (*Id.* at 114.) Like Dr. Don, Dr. Scialli testified that Petitioner's asserted lack of memory of the murder itself did not affect his conclusion that Petitioner was sane at the time of the offense. (*Id.* at 117.) Both Dr. Don and Dr. Scialli concluded that Petitioner suffered from a cyclical mood disorder of a lesser severity than manic-depressive or bipolar disorder. (*Id.* at 121-22; 12/7/92 at 18.)

On cross-examination, Dr. Scialli agreed that Petitioner's condition at the time of the crime – affected by stress from the breakup of the business, lack of sleep and food, mood swings, possible alcohol withdrawal, and the occurrence of a quarrel – might have rendered him "less able to conform his conduct at the time of the offense" (*id.* at 128) and that under such circumstances the offense could be characterized as a "crime of passion" (*id.* at 130). When further questioned by defense counsel, Dr. Scialli also acknowledged that Petitioner's lack of effort to conceal his crime "might be consistent with a lack of premeditation." (*Id.* at 130.)

Analysis

The trial court's preclusion of testimony concerning Petitioner's ability to form a specific intent at the time of the crime was correct under Arizona law and did not violate Petitioner's due process rights. Moreover, even if the court's evidentiary ruling was incorrect, Petitioner was not prejudiced because such evidence was adduced through defense counsel's direct examination of Dr. Blinder and cross-examination of Dr. Scialli.

Arizona has long rejected the affirmative defense of diminished capacity. *State v. Mott*, 187 Ariz. 536, 540-41, 931 P.2d 1046, 1050-51 (1997) (citing *State v. Schantz*, 98 Ariz. 200, 212-13, 403 P.2d 521, 529 (1965)). The practical effect of this rule is that a defendant cannot, during trial, present evidence of mental disease or defect to show that he was *incapable* of forming a requisite mental state for a charged offense. *Mott*, 187 Ariz. at 540, 931 P.2d at 1050; *Schantz*, 98 Ariz. at 213, 403 P.2d at 529; *Clark v. Arizona*, 126 S. Ct.

- 14 -

2709, 2737 (2006) (upholding the constitutionality of the *Mott* rule and finding that the exclusion of expert testimony regarding diminished capacity does not violate due process).

Arizona law does permit a defendant to present evidence to show that he has a *character trait* for acting reflexively, rather than reflectively, for the purpose of challenging a finding of premeditation – i.e., to show that he did not actually reflect after forming the requisite intent. *See State v. Christensen*, 129 Ariz. 32, 35-36, 628 P.2d 583-84 (1981); *Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986).[9] However, this rule is limited in that an expert cannot testify as to whether the defendant was acting impulsively *at the time of the offense*. *Id.* at 35-36, 628 P.2d at 583-84.

Despite this proscription, which the trial court attempted to enforce by limiting the scope of expert testimony, Dr. Blinder did in effect testify as to Petitioner's state of mind at the time of the murder, opining, in sum, that Petitioner acted reflexively rather than reflectively when he attacked Ms. Katuran. Similarly, Dr. Scialli agreed that elements of Petitioner's compromised mental condition and the circumstances of the crime were suggestive of a state of mind inconsistent with premeditation. Through this testimony, counsel presented evidence regarding not only Petitioner's general character trait of impulsivity, but his specific state of mind at the time of the murder. Therefore, Petitioner suffered no prejudice from the trial court's ruling.

Having reviewed the claim de novo, this Court concludes, for the reasons set forth above, that Petitioner is not entitled to relief.

**Claim 4:    Improper Admission of Photographs**

Petitioner asserts that the trial court's admission of inflammatory photographs violated

---

[9]    In *Christensen*, the defendant sought to admit expert testimony regarding his tendency to act without reflection. The Arizona Supreme Court held it was error to exclude such testimony because "establishment of [this character trait] tends to establish that appellant acted impulsively. From such a fact, the jury could have concluded that he did not premeditate the homicide." 129 Ariz. at 35, 628 P.2d at 583.

his rights to due process and equal protection and his rights under the Sixth, Eighth, and Fourteenth Amendments. (Dkt. 62 at 17-18.)

Defense counsel filed a motion objecting to the admission of crime-scene and autopsy photographs of the victim. (ROA 37.) The trial court granted the motion in part, finding that five of the photographs were cumulative. (ME 11/25/92.) The court allowed the admission of the remaining photographs, holding that they were relevant to show the nature, extent, and location of the victim's injuries, to illustrate the pathologist's testimony, to depict the crime scene, and to show the manner in which the offense was committed. (*Id.*) The court further found that, although the photos were "inflammatory and gruesome," their probative value was not substantially outweighed by the danger of unfair prejudice. (*Id.*) Petitioner subsequently moved for a new trial based, inter alia, on the admission of these photos (ROA 111; *see* RT 2/5/93 at 6); the court denied the motion (ME 2/17/93).

On direct appeal, the Arizona Supreme Court rejected Petitioner's arguments that the cumulative effect of the admission of the photos was so inflammatory and prejudicial that he was entitled to a new trial. *Gulbrandson*, 184 Ariz. at 60, 906 P.2d at 593. The court explained:

> These photos were not cumulative and were relevant to show the cause and manner of Irene's death, to prove premeditation, and to illustrate the pathologist's testimony. Although gruesome, their probative value was not substantially outweighed by the danger of unfair prejudice. Further, the defense did not suggest to the trial court any techniques for lessening the effect of the photos by covering extraneous areas of the photos. The trial court did not abuse its discretion by permitting the admission of these photos, nor did it abuse its discretion by denying defendant's motion for a new trial.

*Id.* This decision does not entitle Petitioner to habeas relief.

In general, state law matters are not proper grounds for habeas corpus relief. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v.*

*McGuire,* 502 U.S. 62, 67-68 (1991) (internal quotation omitted).  Only if the admission of the evidence was so prejudicial as to offend due process may the federal courts consider it. *Id.*; *see Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997) (gruesome photos claim "not cognizable" on federal habeas review).  Petitioner's unsupported assertion that admission of the photographs was erroneous, followed by his bare argument that he was prejudiced by "erroneous evidentiary rulings in the aggregate" (Dkt. 62 at 18), fails to sustain his burden of showing that the admission of the photos infringed on a specific constitutional right.  Therefore, Claim 4 is denied.

**Claim 5:       Improper Admission of Other Crimes Evidence**

Petitioner asserts that the trial court's admission of other acts evidence violated his rights under the Sixth Amendment.  (Dkt. 62 at 19-20.)

The trial court allowed the admission of testimony, over defense counsel's objection, regarding Petitioner's Valentine's Day assault of the victim, finding that it was relevant to the issues of intent and premeditation.  (ME 11/25/92.)  On direct appeal, Petitioner argued that the prior incident was distinguishable from the murder because he was intoxicated at the time of the earlier attack but not during the latter, and that admission of the evidence was unduly prejudicial.  (Opening Br. at 25-27.)  The Arizona Supreme Court rejected these arguments and found that the evidence was admissible under Arizona Rule of Evidence 404(b) because it was admitted for a proper purpose and was relevant to show motive and intent, because its probative value was not substantially outweighed by the danger of unfair prejudice, and because Petitioner requested and the trial court provided an appropriate limiting instruction.[10]  *Gulbrandson*, 184 Ariz. at 60-61, 906 P.2d at 593-94.  The supreme

---

[10]       The trial court instructed the jury as follows:

Now evidence of other bad acts of the Defendant has been admitted into evidence in this case. Such evidence is not to be considered by you to prove the character of a Defendant or to show that he committed the offense charged.

court concluded its analysis by observing:

> This other act was very close in time to the murder, defendant assaulted the victim in a similar manner (by strangling), and after the assault he told the Maios that he was going to kill Irene. Furthermore, after this assault, Irene obtained an injunction prohibiting harassment by defendant, and defendant made hostile remarks to the police assistant when served with the injunction. The previous assault and defendant's statements after the assault clearly go to premeditation. We conclude that the trial court did not abuse its discretion by admitting the evidence of the previous assault.

*Id.* at 61, 906 P.2d at 594.

Analysis

As noted with respect to the previous claim, it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. *Estelle v. McGuire,* 502 U.S. at 67-68; *see Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). A federal habeas court is thus prohibited from reviewing whether "other crimes" evidence was properly admitted by the state trial court pursuant to Arizona Rule of Evidence 404(b), which is simply a matter of state evidentiary law. Instead, the admission of evidence at a state trial will form the basis for federal habeas relief only when the evidentiary ruling renders a trial unfair in violation of a petitioner's due process rights. *See Jammal*, 926 F.2d at 919.

The United States Supreme Court has "very narrowly" defined the category of infractions that violate the due process test of fundamental fairness. *Dowling v. United States,* 493 U.S. 342, 352 (1990). Pursuant to this narrow definition, the Court has declined to hold that evidence of other crimes or bad acts is so extremely unfair that its admission violates fundamental conceptions of justice. *Estelle v. McGuire*, 502 U.S. at 75 & n. 5 (stating that Supreme Court was expressing no opinion as to whether a state law would violate due

---

It may, however, be considered by you regarding a Defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(RT 12/14/92 at 107-08.)

process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime); *Spencer v. Texas,* 385 U.S. 554, 563-64 (1967) (rejecting the argument that due process requires the exclusion of prejudicial evidence).  Thus, there is no clearly established Supreme Court precedent which holds that a state violates due process by admitting propensity evidence in the form of other acts evidence.  *See, e.g.*, *Bugh v. Mitchell,* 329 F.3d 496, 512-13 (6th Cir. 2003) (state court decision allowing admission of evidence pertaining to petitioner's alleged prior, uncharged acts of child molestation was not contrary to clearly established Supreme Court precedent because there was no such precedent holding that state violated due process by permitting propensity evidence in the form of other bad acts evidence).

Moreover, although "clearly established Federal law" under the AEDPA refers only to holdings of the United States Supreme Court, this Court notes that even under Ninth Circuit precedent Petitioner would not be entitled to relief.  The Ninth Circuit has held that the admission of "other acts" evidence violates due process only when "there are *no* permissible inferences the jury may draw from the evidence." *Jammal,* 926 F.2d at 920; *see Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005). Therefore, whether or not the admission of evidence is contrary to a state rule of evidence, a trial court's ruling does not violate due process unless the evidence is "of such quality as necessarily prevents a fair trial." *Kealohapauole v. Shimoda,* 800 F.2d 1463, 1465 (9th Cir. 1986).

As the Arizona Supreme Court explained, the evidence detailing Petitioner's previous assault on the victim allowed several permissible inferences, including inferences supporting the key element of premeditation, as well as Petitioner's motive and intent.  Therefore, admission of the evidence did not render Petitioner's trial unfair in violation of his due process rights, and Petitioner is not entitled to relief on Claim 5.

**Claim 7:**     **Failure to Disclose *Brady* Material**

Petitioner contends that the prosecution's failure to disclose witness Sally Maio's

changed testimony prior to trial violated his rights to due process under the Fifth and Fourteenth Amendments.  (Dkt. 62 at 20-21.)

At trial, Ms. Maio testified that Petitioner had telephoned her from jail and told her that Ms. Katuran's death had been an accident, that "he was going to plead insanity and drag this thing out as long as he possibly could," and that "he was going to get off by insanity." (RT 12/3/92 at 48.)   On cross-examination, defense counsel inquired if Ms. Maio had previously reported Petitioner's statement about using an insanity defense; she responded that she had.  (*Id.* at 59.)  The prosecutor acknowledged that Ms. Maio had first advised him of Petitioner's statement that he "was going to get off by insanity" during a conversation that occurred about two-and-a-half hours before she testified; the conversation was not recorded, and the only reference to the statement was contained in the prosecutor's hand-written notes. (RT12/14/92 at 22-24.)

To illustrate that this statement differed from Ms. Maio's previous account of her conversation with Petitioner, the trial court allowed defense counsel to play for the jury a tape-recorded pretrial interview of Ms. Maio, which had been conducted by both counsel. (RT 12/10/92 at 105.)  During that interview, Ms. Maio said that Petitioner told her he would beat the charges against him and get out of jail soon.  (12/14/92 at 29.)  The court also allowed defense counsel to call for testimony from Petitioner's previous counsel and defense investigators who stated that Ms. Maio had not reported Petitioner's comments about an insanity defense to them.  (RT 12/10/92 at 98, 101; RT 12/14 at 41.)  Finally, the court allowed counsel to stipulate for the jury that "there is no record of Mrs. Sally Maio making any statement regarding David Gulbrandson saying anything about using the insanity defense to get off until the day of her testimony, approximately two-and-a-half hours before she testified when she was being prepared for her testimony by Mr. Morrison [the prosecutor]." (*Id.* at 41-42.)

The trial court denied Petitioner's motions for a mistrial (*id.* at 29-30; ME 12/14/92)

and for a new trial (ME 2/17/93), finding that Ms. Maio's statements were not inconsistent and that there was no misconduct by the prosecutor.   The Arizona Supreme Court also rejected Petitioner's *Brady* claim:

> Defendant has a due process right to timely disclosure of material evidence. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963); *Atwood,* 171 Ariz. at 606, 832 P.2d at 623.  However, in this case, the prosecutor was not aware of this statement until immediately before Ms. Maio's testimony.  Both counsel had previously interviewed this witness, and the trial court allowed defendant to play Ms. Maio's tape-recorded pretrial interview.   Furthermore, we agree with the trial court that Ms. Maio's testimony at trial was not inconsistent with what she had stated previously at the tape-recorded interview.

*Gulbrandson*, 184 Ariz. at 63, 906 P.2d at 596.  This decision was not an unreasonable application of *Brady v. Maryland*, 373 U.S. 83 (1963).

*Brady* holds that the prosecution violates a defendant's due process rights if it fails to turn over evidence that is "material either to guilt or to punishment." *Id.* at 87. In order to prevail on a *Brady* claim, a defendant must demonstrate that: (1) the evidence at issue is favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice resulted. *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). The information at issue satisfies none of these criteria.

As the trial court and the Arizona Supreme Court noted, Ms. Maio's trial testimony was not inconsistent with her prior statement but an elaboration thereof; therefore, its impeachment value was negligible.  Moreover, the State obtained this more-detailed account of Ms. Maio's conversation with Petitioner only when the prosecutor spoke with her immediately prior to her testimony.  Finally, any potential prejudice from a lack of disclosure was more than offset by the playing of the tape-recorded pretrial interview of Ms. Maio, defense counsel's cross-examination of Ms. Maio, the testimony of other witnesses who had interviewed Ms. Maio, and the stipulation of the prosecutor, all of which served to emphasize the fact that Ms. Maio did not inform anyone until the day of her testimony that Petitioner

specifically indicated that he intended to beat the charges by using an insanity defense. Through these means, defense counsel accomplished as much in the way of impeachment of Ms. Maio's testimony as he would have achieved had her statements been immediately disclosed.

No *Brady* violation occurred, the state court's finding to that effect was reasonable, and Petitioner is not entitled to relief on this claim.

**Claim 8:**       **Improper Communications With Witnesses**

In his amended habeas petition, Petitioner asserted that the prosecutor improperly relayed the medical examiner's testimony to other witnesses in violation of his rights under the Sixth Amendment. (Dkt. 27 at 44-45.) As Respondents note, Petitioner appears to have abandoned this claim, which he does not discuss in his merits brief or reply.

The Court finds that Petitioner has waived this claim and, alternatively, that the claim is without merit. The Arizona Supreme Court rejected the claim, holding that the prosecutor did not violate Rule 9.3 of the Arizona Rules of Criminal Procedure by speaking with the witnesses jointly; that the Petitioner did not show that he was prejudiced by the prosecutor's actions; that the witnesses' testimony was unrelated to the subject matter the prosecutor allegedly discussed with them; that there was no evidence that the prosecutor coerced or intimidated the witnesses, induced them to testify falsely, or shared information with them so that their stories would "gel"; and, finally, that "the record does not even support defendant's allegation that the prosecutor talked to the witnesses." *Gulbrandson*, 184 Ariz. at 63-64, 906 P.2d at 596-97. Nowhere does Petitioner argue, let alone demonstrate, that this decision was contrary to or an unreasonable application of clearly established federal law or that it was based upon an unreasonable determination of the facts. Therefore, Petitioner is not entitled to relief on Claim 8.

**Claim 9:**       **Denial of Right to Testify**

Petitioner asserts that the trial court's failure to ensure that he knowingly waived his

1    right to testify on his own behalf violated his rights to due process and equal protection and

2    his rights under the Fifth, Sixth, and Fourteenth Amendments.  (Dkt. 62 at 21-35.)

3        State court decision

4        On direct appeal, Petitioner argued that the trial court had a *sua sponte* duty to make

5    an on-the-record inquiry into his waiver of the right to testify, and that his conviction should

6    be reversed because he did not affirmatively waive that right.  The Arizona Supreme Court

7    rejected this argument, on the grounds that neither federal nor state law requires an on-the-

8    record waiver of the right to testify.  The court explained:

9            The United States Supreme Court has held that a defendant has a
10      fundamental right, guaranteed under the Constitution, to testify.  *Rock v.
        Arkansas,* 483 U.S. 44, 53 n. 10, 107 S.Ct. 2704, 2710 n. 10, 97 L.Ed.2d 37
11      (1987); *see also State v. Tillery,* 107 Ariz. 34, 37, 481 P.2d 271, 274 (1971).
        However, the Supreme Court has not stated whether the defendant must make
12      a knowing, intelligent, and voluntary waiver of this right.  *Cf. Johnson v.
        Zerbst,* 304 U.S. 458, 464-65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)
13      (holding that fundamental right to counsel requires trial judge to determine
        whether defendant has made "an intelligent and competent waiver").
14      Mechanisms are currently present to ensure a defendant's knowing, intelligent,
        and voluntary waiver of other fundamental rights.  *See, e.g.,* rule 6.1(c) &
15      Form 8, Arizona Rules of Criminal Procedure (waiver of right to counsel); rule
        17.1(b) & Form 18 (waiver of right to present a defense when defendant pleads
16      guilty); rule 18.1(b) & Form 20 (waiver of right to jury trial).

17            State courts have differed as to whether the trial judge must
        affirmatively determine that a defendant is aware of and wishes to relinquish
18      the right to testify. *Compare LaVigne,* 812 P.2d at 222 (requiring on-the-record
        waiver) *and People v. Curtis,* 681 P.2d 504, 514 (Colo.1984) (holding that trial
19      judge must ascertain competent waiver by defendant) *and State v. Neuman,*
        371 S.E.2d 77, 81-82 (W.Va.1988) (requiring trial judge to advise defendant
20      of right to testify and stating that valid waiver cannot be presumed from silent
        record) *with Siciliano v. Vose,* 834 F.2d 29, 30 (1st Cir.1987) (finding no
21      constitutional requirement that state court trial judge must inform defendant
        of right to testify and that such an inquiry might inappropriately influence
22      defendant to waive his right not to testify) *and Allie,* 147 Ariz. at 328, 710
        P.2d at 438 (presuming waiver based on defendant's failure to testify) *and*
23      *Aragon v. State,* 114 Idaho 758, 760 P.2d 1174, 1179 (1988) (requiring on-the-
        record waiver might provoke judicial participation that could interfere with
24      defense counsel's trial strategy).

25            This court has stated that a defendant must make his desire to testify
        known at trial and cannot allege this desire as an afterthought.  *See State v.*
26      *Martin,* 102 Ariz. 142, 147, 426 P.2d 639, 644 (1967).  In *Allie,* the court held
        that a *sua sponte* inquiry by the trial court regarding a defendant's right to

27

28                                                - 23 -

testify is neither necessary nor appropriate.  147 Ariz. at 328, 710 P.2d at 438.

> Although we think that in an appropriate case it may be prudent for a trial court to have a defendant make an on-the-record waiver of the right to testify, see *Martin,* 102 Ariz. at 145, 426 P.2d at 642, it is not generally required under Arizona law.  We conclude that defendant was not denied his right to testify and is not entitled to a new trial based on the failure to make an on-the-record waiver.

*Gulbrandson*, 184 Ariz. at 64-65, 906 P.2d at 597-98.

Analysis

As the Arizona Supreme Court correctly noted, although a defendant does have the constitutional right to testify on his own behalf, *Rock v. Arkansas,* 483 U.S. 44, 51 (1987), the United States Supreme Court has not yet determined whether the trial court has an affirmative duty to advise the defendant of this right or obtain an on-the-record waiver.  *See Thompson v. Battaglia*, 458 F.3d 614, 619 (7th Cir. 2006).

Petitioner concedes that several circuits, including the Ninth, have held that the trial court has no duty to make such an inquiry.  *See United States v. Pino-Noriega*, 189 F.3d 1089, 1094-95 (9th Cir. 1999) (waiver of the right to testify "need not be explicit" and a "court has no duty to affirmatively inform defendants of their right to testify, or to inquire whether they wish to exercise that right"); *United States v. Joelson*, 7 F.3d 174, 177 (defendant is "presumed to assent to his attorney's tactical decision not to have him testify"); *United States v. Edwards*, 897 F.2d 445, 447 (9th Cir. 1990) ("broad rule that the court has no duty sua sponte to advise a defendant of his right to testify would be meaningless if it were possible for defendants to obtain new trials simply by claiming ignorance of the right"); *United States v. Martinez*, 883 F.2d 750, 755-58 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir. 1991) (distinguishing right to testify from other fundamental rights); *see also Frey v. Schuetzle*, 151 F.3d 893, 898 (8th Cir. 1998) (defendant waived right to testify when he acquiesced to counsel's advice because "a knowing and voluntary waiver of the right may be found based on a defendant's silence when his counsel rests without calling

- 24 -

him").  As the Seventh Circuit explained in *Thompson*, "The variety in practice among state courts and the various circuits shows, unfortunately for [the habeas petitioner] Thompson, that there is no standard clearly established by the Supreme Court of the United States that is binding on all."  458 F.3d at 619.  Therefore, the Arizona Supreme Court's rejection of this claim was not an unreasonable application of clearly established federal law.

Petitioner insists that his case is distinguishable from the Ninth Circuit precedent cited above because he clearly and consistently insisted to counsel and indicated to the trial court that he wished to testify and because his counsel failed to consult with him on the issue. (Dkt. 62 at 32-35.)  These assertions, the factual accuracy of which is at best debatable *(see infra*, 29-31), are irrelevant to the issue before this Court in its application of the AEDPA. Because, as Petitioner himself concedes, "the United States Supreme Court has yet to decide . . . what actions must be taken to protect [the] . . . right to testify" (*id.* at 31), the Arizona Supreme Court's rejection of this claim cannot form the basis for habeas relief.  *See Carey v. Musladin*, 127 S. Ct. at 653-54 (denying habeas relief in absence of clearly established federal law).  Claim 9 is therefore denied.

### Claim 11:      Improper Consideration of Victim Impact Evidence

Petitioner asserts that the trial court's consideration of victim impact evidence violated his rights to due process and equal protection and his rights under the Eighth and Fourteenth Amendments.  (Dkt. 62 at 36-37.)

At the sentencing hearing and in the presentence report, Ms. Katuran's family members made statements advocating a death sentence for Petitioner.  On direct appeal, Petitioner argued that the admission of the statements violated his right to be free of cruel and unusual punishment.  The Arizona Supreme Court rejected the claim:

> In past cases we generally have assumed that trial judges are capable of focusing on the relevant sentencing factors and ignore any "irrelevant, inflammatory, and emotional" statements when making the sentencing decision. *Bolton,* 182 Ariz. at 316, 896 P.2d at 856; *State v. Greenway,* 170 Ariz. 155, 163, 823 P.2d 22, 30 (1991); *State v. Beaty,* 158 Ariz. 232, 244, 762

1    P.2d 519, 531 (1988). We will do so again in this case because nothing in the
2    record indicates that the trial judge gave weight to the victims' statements.

*Gulbrandson*, 184 Ariz. at 66, 906 P.2d at 599. This decision is neither contrary to nor an

unreasonable application of clearly established federal law.

In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the

introduction of a victim impact statement during the sentencing phase of a capital case

violated the Eighth Amendment. In *Payne v. Tennessee*, 501 U.S. 808, 827, 830 (1991), the

Supreme Court revisited *Booth* and overruled it in part, holding that the Eighth Amendment

does not erect a per se barrier to the admission of victim impact evidence but leaving intact

*Booth*'s prohibition on the admissibility of characterizations and opinions from the victim's

family about the crime, the defendant, or the appropriate sentence to be imposed. *Id.* at 830

n.2.

Under Arizona law at the time of Petitioner's trial, the trial judge, rather than a jury,

determined the penalty in a capital case. A.R.S. § 13-703. As the Arizona Supreme Court

explained, judges are presumed to know and apply the law. *Gulbrandson*, 184 Ariz. at 66,

906 P.2d at 599; *see Jeffers v. Lewis*, 38 F.3d 411, 415 (9th Cir. 1994). Therefore, "in the

absence of any evidence to the contrary, [the Court] must assume that the trial judge properly

applied the law and considered only the evidence he knew to be admissible." *Gretzler v.*

*Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997).

There is no evidence to the contrary; in fact, the trial court specifically stated that

while it had "reviewed" the victim impact information, it "want[ed] the record to be clear that

the Court's finding with respect to aggravation/mitigation are [sic] based solely upon the

statutory requirements of the evidence presented at the 703 hearing." (RT 2/19/92 at 19-20.)

Because there is no evidence that the trial court disobeyed or misapplied the law and

improperly considered the opinions of the victim's family members when imposing the death

sentence, Petitioner is not entitled to relief on Claim 11.

- 26 -

1

**Claim 12:     Ineffective Assistance of Counsel (Guilt Stage)**

2        Petitioner alleges that he was denied his right to the effective assistance of counsel

3 under the Fifth, Sixth, Eighth, and Fourteenth Amendments.   (Dkt. 62 at 57-69).

4 Specifically, Petitioner alleges that the following aspects of counsel's performance during

5 the guilt stage of trial constituted ineffective assistance: failure to call Petitioner to testify,

6 Claim 12(B); failure to elicit testimony of insanity, 12(C); failure to elicit testimony of

7 impulsivity, 12(D); failure to request appointment of blood spatter expert, 12(E); and failure

8 to make a cogent argument regarding lack of premeditation, 12(F).[11] (Dkt. 62 at 37-53.)  The

9 PCR court, citing *Strickland*, rejected all of Petitioner's ineffective assistance of counsel

10 ("IAC") claims.  (ME 1/25/98.)

11        Background

12        Petitioner's first counsel, Michael Smith, of the Maricopa County Public Defender's

13 Office, moved to withdraw on the eve of trial, citing an ethical dilemma that would make it

14 difficult for him to proceed with Petitioner's defense (ROA 54; RT  2/18/92 at 9-10); the

15 court granted the motion and continued the trial.  (RT 2/18/92 at 23; ME 2/18/92.)  New

16 counsel, Doug Harmon, also moved to withdraw, indicating that Petitioner disagreed with

17 his defense strategy and wished to represent himself (*see* ROA 51); Harmon, like Smith,

18 explained that the defense strategy proposed by Petitioner placed counsel in an ethical

19 dilemma (*id.*; RT 4/28/92 at 4).   The court granted the motion to withdraw, allowed

20 Petitioner to represent himself, appointed Spillman as advisory counsel, and again continued

21 the trial date.  (*See* ME 4/28/92; RT 4/30/92.)  On August 6, 1992, Petitioner moved to

22 withdraw his pro per status and have Spillman appointed counsel; the court granted the

23 motion and again continued the trial.  (ME 12/6/92.)  On August 31, 1992, Spillman filed a

24

25        [11]    Claim 12(G) consists of the allegation that counsel was ineffective for failing
26 to submit evidence to rebut the "heinous or depraved" aggravating factor by presenting Dr.
27 Blinder's opinion regarding Petitioner's mental state at the time of the murder.  (Dkt. 62 at
54-61.) The Court includes this sentencing-stage IAC claim in its discussion of Claim 13.

28

motion for the appointment of additional counsel (ROA 67), which the court denied (ME 9/4/92). Spillman represented Petitioner throughout the trial and sentencing.

<u>Clearly established federal law</u>

For a claim alleging ineffective assistance of counsel, the applicable law is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. 466 U.S. at 687-88. The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. To prove deficient performance, a defendant must also overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Hayes v. Woodford*, 301 F.3d 1054, 1066 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691). To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted). As the Supreme Court recently reiterated, "In judging the defense's

investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689, 691).

12(B): Failure to call Petitioner to testify

*Background:*

Before trial, defense counsel listed Petitioner as a possible witness.[12] (ROA 20a.) At an in-chambers conference on the final day of trial, counsel informed the court that "the defendant might have decided he wants to testify. If he does, we might have a little more time." (RT 12/14/97 at 37.) Thereafter, counsel called one more witness and then rested his case; Petitioner did not testify. (*Id.* at 42.)

At the presentence (or "aggravation/mitigation") hearing, Petitioner made a lengthy statement to the court. (RT 2/5/93 at 29-51.) The statement included complaints about the legal process (a "circle of injustice and mockery" (*id.* at 49-50)) and the quality of his representation ("an unfortunate and bizarre collection of attorneys" (*id.* at 39-40), "the despicable representation that was foisted on me, the ill-investigated, ill-prepared, ill-presented defense" (*id.* at 49)).[13] In this context, Petitioner explained to the court:

_____

[12]   As discussed above, Petitioner's desire to testify was a also topic of discussion before the trial court when prior counsel moved to withdraw due to ethical concerns about Petitioner's desired defense strategy.

[13]   Petitioner's statement also included his characterization of the prosecutor ("unethical and ambitious" (RT 2/5/93 at 39)), his previous business partners (who "took another multi-million dollar company away from me" (*id.* at 44)), the Maios (who "stole my company, blatantly lied on the stand" (*id.* at 31)), and the victim (who, according to Petitioner, was fired from one company for "stealing" and who "taunted" him and "knew which buttons to press" (*id.* at 46)).

At the sentencing hearing Petitioner again protested that he had been denied his right to testify. (RT 2/19/05.) He also reiterated his dissatisfaction with the outcome of his case ("how in the hell do I get convicted of First Degree Murder?"). (*Id.* at 20.) Finally, he

Mr. Spillman felt that I should not testify. I felt differently. Mr. Spillman told me he would see me before court, the last day of trial, and discuss the pros and cons of my testifying. I had made a list of questions.

Mr. Spillman, following the same conduct since last August, did not see me before the last day of trial. And when I was brought into court for the last witness and the closing arguments, he told me it was too late for me to testify. My question will always be: Why wasn't I allowed to testify on my own behalf?

(*Id.* at 36-37.)

Following Petitioner's statement, Spillman shared with the court his account of the decision not to call Petitioner to testify at trial:

Regarding our conversation concerning the Defendant's testifying, he did, in fact, indicate he had a desire to testify. We had more than one discussion about the benefits and possible absence of benefits of him testifying. In fact, the day before the case presented by the defense was to end I had discussions with him about whether or not to testify, and I advised him that it would be up to him. He would be the one to make the decision. I advised him not to testify and on the last day that we presented evidence he indicated to me that he was taking that advice and was not going to testify. I did not at any point in time tell him he could not testify, nor did I ever tell him that it was too late at any point for him to testify. It was his decision not to testify.

(*Id.* at 51-52.)

Documents filed in the PCR proceeding and this habeas action support each of these conflicting versions of the events surrounding the conclusion of the defense case and Petitioner's absence from the witness stand. For example, Petitioner's mother and sisters offered the following response to statements from Ms. Katuran's family members:

You get a family up here. They are grieving and everything else. They want some answers. There was no answers provided for them. Sure, they get up and say, well, let's kill him. Someone dear was taken from you. They said revenge. Let's kill him. That's what – that's – I had my company taken from me. I never had the feeling of revenge or let's kill. Something is very wrong here. I'm disgusted. Shame on you and shame on this system. Period. I'm through talking.

(*Id.* at 21-22.)

attest in affidavits dated May 30, 1996, that Petitioner had informed them that "[w]ild horses could not keep [him] from testifying" and that "on the last day of trial . . . Defendant turned to his family in court and stated: 'I am not going to be allowed to testify.'" (ROA-PCR 256, Ex's B, C, and D.)  Similarly, Petitioner's affidavit indicates that he was "shocked" when Spillman rested the defense case without calling for his testimony.  (*Id.*, Ex. A at 2.)

In a deposition from December 13, 2000, Spillman stated that on several occasions prior to trial he and Petitioner discussed whether Petitioner should testify.  (Dkt. 62, Ex. A at 30.)  During those discussions, Petitioner indicated that he wanted to testify. (*Id.* at 63.)  Spillman asked Petitioner what his testimony would be, and, according to Spillman, Petitioner explained that he would testify "that I don't remember what happened and that I couldn't have done it."  (*Id.* at 66.)  Spillman then expressed his reservations to Petitioner: "I don't know that that's going to benefit you to testify that you couldn't have done it and that you don't remember"; he further cautioned Petitioner, "That's not much factual information, and I think that the court and the jury is going to want to hear factual information from you as to the fact that you didn't do it."  (*Id.* at 67.)  Spillman also told Petitioner that he was concerned that if he testified he would "open [himself] to cross-examination."  (*Id.*)  When Petitioner's habeas counsel inquired whether Petitioner nonetheless could have offered valuable testimony about the events preceding the attack on Ms. Katuran, such as the reason for his visit to her home and her provocative act of throwing a scissors at him, Spillman explained that:

> Well, he was pretty sketchy even on the events leading up to that and he was not ever, in my conversation with him, very certain about the fact that he went there.  And he said, "I kind of remember the scissors-throwing but I think it was that time but it could have been another time."
>
> So, he was very uncertain on these things, you know.  He may be more certain now but at that time, he was uncertain, you know, on how he got to the house, and he thought he walked, and the scissors-throwing, maybe it took place then but maybe it took place another time, so, you, know, his absence of

1    certainty about those things gave me some difficulty.[14]

2    (*Id.* at 68.)

3        Finally, regarding the decision that Petitioner would not testify, Spillman explained

4    that he spoke with Petitioner at the counsel table on the final day of trial, asking, "Are you

5    going to testify?  I don't recommend that you do.  It's up to you."  According to Spillman,

6    Petitioner then answered, "No." (*Id.* at 66.)  Spillman surmised that Petitioner's decision not

7    to testify was based on his desire not to subject himself to cross-examination by the

8    prosecutor.  (*Id.* at 72.)  Spillman did not recall Petitioner ever turning to his family during

9    the trial and saying, "I'm not going to be allowed to testify."  (*Id.*)

10        *Analysis:*

11        The PCR court rejected this claim, finding that neither prong of *Strickland* had been

12    satisfied.  (ME 1/5/98 at 3-4.)  With respect to deficient performance, the PCR court found

13    that Petitioner "has not demonstrated that his counsel's advice not to testify was unreasonable

14    under the circumstances" and that Petitioner simply "regrets his decision to follow that

15    advice."  (*Id.* at 3.)  With respect to prejudice, the PCR court reviewed Petitioner's affidavit

16    (ROA-PCR 256, Ex. A) and considered the testimony Petitioner would have offered had he

17    been called, which included his version of the events leading up to the attack on Ms. Katuran,

18    and determined that the testimony would have been cumulative to evidence introduced

19    through other testimony and insufficient to overcome the "substantial" evidence of

20    premeditation.  (ME 1/5/98 at 3-4.)  The PCR court concluded that, "Considering the totality

21

22    _____

23        [14]    Petitioner now disputes that he was ever equivocal in reporting that Ms.

24    Katuarn precipitated the assault by throwing a scissors at him.  (Dkt. 62, Ex. B at 5.)
     However, his description of the incident to Dr. Blinder does not include any mention of Ms.

25    Katuran throwing a scissors (ROA 125z), and in Dr. Don's report, dated May 27, 1992,
     Petitioner is quoted as saying, "We started arguing – I don't know what about, probably the

26    business.  Something happened – I'm not sure but I think she threw a pair of scissors at me"
     (ROA 125ff-125gg).  This information lends credibility to Spillman's characterization of

27    Petitioner's original account of the attack as vague and unhelpful.

28

of the evidence before the jury, the Court finds no reasonable probability that the result of the trial would have been different if Defendant had testified as set forth in his affidavit." (*Id.* at 4.)

As an initial matter, this Court notes that the Ninth Circuit has held that an IAC claim based upon counsel's waiver of a defendant's right to testify is "precluded" by the holding in *Edwards*, 897 F.2d at 447 – i.e., that the court has no duty to inform a defendant of his right to testify or to ensure an on-the-record waiver of that right. *United States v. Nohara*, 3 F.3d 1239, 1243-44 (9th Cir. 1993). To the extent that Petitioner's IAC claim survives this holding, the Court find it meritless.

In rejecting the claim, the PCR court reasonably applied *Strickland*. First, as the PCR court noted, Petitioner has failed to show that counsel performed deficiently in advising him not to testify. This is because, as explained above, counsel had legitimate concerns about the value of placing Petitioner on the stand and exposing him to cross-examination when the substance of his testimony would have been that he did not remember the attack itself but that he was sure he could not have committed the murder because he was "just not that kind of person." (Dkt. 62, Ex. A at 71.) In addition, "the advice provided by a criminal defense lawyer on whether his client should testify is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." *Carter v. Lee,* 283 F.3d 240, 249 (4th Cir. 2002) (internal quotation omitted); *see United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (counsel not ineffective for failing to call defendant to the stand, despite defendant's repeatedly expressed desire to testify, because "[i]t was a reasonable tactical decision to rely exclusively on attacking the Government's witnesses and presenting independent testimony rather than to subject [defendant] to all of the risk attendant on cross-examination"); *Smith v. Jones*, 923 F.2d 588, 590 (8th Cir. 1991) (counsel's strategic decision not to call defendant to testify, based on concerns about his credibility, was not ineffective assistance); *United States v. Dyer*, 784 F.2d 812, 817 (7th Cir. 1986) (decision

1   whether defendant should testify is a "tactical choice of trial strategy" and thus not subject

2   to review).

3        As the PCR court explained, Petitioner has also failed to show that he was prejudiced

4   by counsel's failure to call him as a witness.  Petitioner's version of the events prior to the

5   murder – including his innocent explanation for his decision to visit Ms. Katuran and his

6   claim that she threw a scissors at him, impliedly precipitating the attack – were testified to

7   by Dr. Don.  This account was never contradicted, and was not challenged on cross-

8   examination, as it would have been if Petitioner had testified.  *See United States v. Harris*,

9   408 F.3d 186, 192-93 (5th Cir. 2005) (no prejudice from defendant's failure to testify when

10  much of his testimony was "elsewhere in the record" and it was likely that he "would make

11  a remarkably bad witness for himself" so that putting him on the stand "probably would have

12  done more harm than good"); *United States v. Mullins*, 315 F.3d 449, 456 (5th Cir. 2002) (no

13  prejudice where much of defendant's testimony was put before the jury by other witnesses).

14       Given his claimed lack of memory, the only other detail about which Petitioner could

15  have testified that was not presented to the jury by other witnesses was his choice of

16  wardrobe; Petitioner asserts that if he had taken the stand, he could have explained that he

17  always wore black clothing, so the fact that he was dressed in black when he went to the

18  victim's home was not a sign of premeditation.  (Dkt. 80, Ex. A at 3.)  This explanation for

19  the black clothing arises for the first time in these habeas proceedings.[15]  There is no

20  indication that Petitioner provided this information to counsel and, more significantly, there

21  is no reasonable probability that the outcome of the trial would have been different if

22  Petitioner had offered such testimony to the jury.  *See Atwater v. Crosby*, 451 F.3d 799, 810-

23  11 (11th Cir. 2006) (no prejudice from defendant's failure to testify where there was

24

25  _____

26       [15]   The affidavit Petitioner filed during the PCR proceedings does not mention that
27  he was prepared to testify that there was an innocent explanation for the fact that he was
    wearing black clothing at the time of the murder. (ROA-PCR 256, Ex. A.)

28

"overwhelming evidence of his guilt"); *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001) (same).

Other areas of Petitioner's proposed testimony – for example, his complaint that Ms. Katuran and the Maios were conspiring to steal his business from him – could easily have backfired, as could his detailed characterization of Ms. Katuran's attitude during their confrontation as "angry, argumentative, hostile and disrespectful to me." (ROA-PCR 256, Ex. A.)  The latter comments about Ms. Katura could have been viewed as an unfair and unsympathetic blaming of the victim – who, after all, had just obtained a restraining order against Petitioner following an incident in which he attacked and choked her – while also emphasizing the convenient nature of Petitioner's amnesia, which allowed him to recall only circumstances favorable to his defense.  Similarly, the difficulties prior counsel experienced with Petitioner and their ethical concerns about his proposed testimony, together with the tone and substance of the comments Petitioner offered at the presentence and sentencing hearings, cast doubt on Petitioner's effectiveness as a witness and suggest that Petitioner was not prejudiced by Spillman's decision not to present his testimony to the jury.

In addition, the value of Petitioner's proposed testimony is called into question by the evolution of his account of events as presented in his affidavits and in his arguments for habeas relief.  For example, Petitioner now contends that his testimony would have supported the theory that he did not premeditate the murder because he was present at the victim's home for an "extended period" of "many hours" before the killing took place; during this period the couple engaged in "lengthy and presumably peaceful conversations."  (Dkt. 80 at 22-23; *see* Dkt 81 at 3.)  However, Petitioner did not recount this memory of a "lengthy" and amicable conversation with the victim until his affidavit of September 20, 2001.  (Dkt. 81 at 3.)

In previous affidavits, Petitioner described going to the victim's home that night to ask for a spare key; he knocked on the door, at which point "Irene opened the door a crack,

told me to go, but finally went to look for the key. She then let me in her home to search for myself when she couldn't find it. The shouting match that ensued escalated to the point where she ultimately threw the scissors at me." (Dkt. 62, Ex. B at 6-7.) In an earlier affidavit, Petitioner's account was even more glaringly inconsistent with the version he now offers; thus, in 1997 Petitioner attested: "That when I arrived at Ms. Katuran's residence, she was angry, hostile and disrespectful to me; and That Ms. Katuran threw, in anger, a pair of scissors at me and after that point I have no memory of events until my experience in Nevada."[16] (ROA-PCR 256, Ex. A.) In neither of these accounts did Petitioner remember engaging in hours of peaceful conversation with Ms. Katuran before she threw the scissors and his memory went blank.

Because the latest, most favorable, version of Petitioner's story had not yet been formulated at the time of trial, defense counsel's failure to call on Petitioner to offer that version to the jury cannot be deemed unreasonable. Moreover, given the self-serving inconsistency of Petitioner's sworn accounts of the night's events, counsel's advice that Petitioner not testify and expose himself to cross-examination appears to have been strategically sound.

Finally, Petitioner contends that if he had been called as a witness he could have testified about his mental health history and his emotional condition at the time of the crime. However, counsel introduced this evidence through the testimony of expert witnesses and Petitioner's family members without subjecting Petitioner to potentially damaging cross-examination.

---

[16] This version comports with Petitioner's earliest descriptions of the incident. For example, in Dr. Blinder's report, dated August 26, 1992, Petitioner indicated that he went to the victim's home to get a spare key. "She was not pleased to see him. They started arguing about the business – 'a real screaming match.' The next thing he remembers is driving to Nevada in her car . . ." (ROA 125z.) Similarly, in relaying the details of the encounter to Dr. Don, Petitioner did not report that a lengthy and peaceful conversation preceded the argument. (ROA 125ff-gg.)

1

2

3

4

5

In sum, the record shows that defense counsel advised – but did not direct or order – Petitioner not to testify and that Petitioner acceded to that advice.  The record further demonstrates that counsel's advice was strategically reasonable and that Petitioner was not prejudiced by its implementation.  Therefore, the PCR court's rejection of this IAC claim was a reasonable application of *Strickland* and Petitioner is not entitled to relief.

6

12(C) and 12(D): Failure to elicit testimony of insanity and impulsivity

7

8

9

10

11

12

The PCR court rejected these claims, finding, first, that at the time of trial Dr. Blinder told defense counsel "that he was unwilling to testify that Defendant was McNaughten [sic] insane" and therefore "counsel's decision not to ask Doctor Blinder his opinion regarding insanity at the time of the murder was reasonable under the circumstances."  (ME 1/5/98 at 5.)  Because counsel's "decision was a strategic or tactical choice that had a 'reasonable basis,'" it did "not constitute ineffective assistance of counsel."  (*Id.*)

13

14

15

16

17

18

19

20

21

22

With respect to testimony concerning impulsivity, the PCR court found that Dr. Blinder "was permitted to testify at length about Defendant's state of mind both generally and at the time of the murder, in terms of his inability to premeditate" and that he testified "that absent stress and the Defendant's mental disabilities, no physical altercation would have occurred without provocation."  (*Id.* at 6.)  The court also noted that defense counsel elicited, through the use of "hypothetical" questions, testimony from Dr. Blinder as to Petitioner's state of mind at the time of the murder.  (*Id.* at 6-8.)  Because counsel did in fact present Dr. Blinder's opinions about Petitioner's ability to premeditate or act "reflectively" as opposed to "reflexively," Petitioner was not prejudiced by counsel's performance.  (*Id.* at 8.)

23

24

25

26

27

As the PCR court noted, Dr. Blinder was not prepared to testify that Petitioner met the legal definition of insanity.  In an affidavit from June 1997, defense counsel Spillman attested that, "Before trial, Dr. Blinder repeatedly told me that he was unwilling to render an opinion that Mr. Gulbrandson was *M'Naghton* [sic] insane at the time of the murder." (Dkt. 63, Ex. B.)  The PCR court also correctly observed that Dr. Blinder's report, as well as his

28

subsequent affidavit, stop short of concluding that Petitioner was insane under *M'Naghten* at the time of the murder.[17]  (ROA 125u-125cc; ROA-PCR 256, Ex. E.)  Because Dr. Blinder was unable to testify that Petitioner was insane, trial counsel did not perform ineffectively by failing to ask him to do so.

The claim that counsel failed to elicit Dr. Blinder's opinion that Petitioner acted impulsively at the time of the murder is belied by the record.  As discussed above (Claim 3), and as acknowledged by the Arizona Supreme Court and the PCR court, counsel was able to elicit testimony from Dr. Blinder in excess of that permitted by the trial court's evidentiary ruling, a ruling which was itself correct under Arizona law and unobjectionable on due process grounds.  The fact that the trial court did not extend even further the latitude with which counsel was allowed to question Dr. Blinder regarding Petitioner's state of mind at the time of the murder does not support a finding of IAC under either prong of *Strickland*. Similarly, Petitioner's complaint that counsel did not specifically question Dr. Blinder about

---

[17]     Dr. Blinder's original report, dated August 26, 1992, does not contain a discussion of the *M'Naghten* standard, much less a conclusion, definitive or otherwise, that Petitioner met that standard.  (ROA 125u-125cc.)  The report does set forth the four diagnoses Dr. Blinder testified to at trial, along with Dr. Blinder's opinion that:

> If [Petitioner's] reports of the decedent's conduct be accurate, at the very least, the degree of provocation he experienced prior to the homicide, his longstanding lack of emotional resources, his increasing stress and psychological disorder, and the narcissistic rage he experienced just prior to the homicide, all compel a "heat of passion" dynamic, rather than premeditated murder.

(*Id.* at 125cc.)
In his 1997 affidavit, attached to the PCR petition, Dr. Blinder attested that he was prepared to testify at trial that at the time of the fatal attack on the victim, Petitioner "was suffering . . . from mental illnesses . . . that would significantly affect his ability to appreciate the nature and quality of his acts or to understand right from wrong" and that "he was suffering from . . . longstanding mental illnesses and was acting in the heat of passion and did not act premeditatively." (ROA-PCR, Ex. E.)  This statement, of course, also falls short of endorsing a finding of *M'Naghten* insanity.

- 38 -

Petitioner's "character trait for impulsivity" as allowed by Arizona law (Dkt. 62 at 48, 50) is specious given the fact that Dr. Blinder offered testimony that Petitioner acted impulsively *at the time of the crime*.

The PCR court did not apply *Strickland* unreasonably in denying these IAC allegations, and Petitioner is not entitled to relief.

### 12(E): Failure to request appointment of blood spatter expert

Petitioner alleges that counsel was ineffective for failing to retain a blood spatter expert. He asserts that testimony from such an expert would have shown that the murder was "passionate, rather than cold-blooded," thus countering the State's theory that the crime-scene evidence supported a finding of premeditation. (Dkt. 62 at 54.) This Court agrees with the finding of the PCR court (ME 1/5/98 at 10) that the claim is without merit because Petitioner has made no showing that such an expert existed or would have testified in contradiction of the State's experts. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (habeas petitioner "offered no evidence that an arson expert would have testified on his behalf at trial. He merely speculates that such an expert could be found. Such speculation, however, is insufficient to establish prejudice.").

Because the decision of the PCR court was neither contrary to nor an unreasonable application of clearly established federal law, Petitioner is not entitled to relief on this claim.

### 12(F): Failure to cogently argue lack of premeditation

Petitioner contends that counsel's closing argument was inadequate because it did not focus on the facts suggesting that the murder was committed in the heat of passion (Dkt. 62 at 45) and failed "to educate the jury about the need for establishing premeditation-reflection beyond a reasonable doubt" (Dkt. 27 at 66). The PCR court rejected this argument:

> Because Defendant's present counsel might have argued the issue of premeditation differently does not establish Defendant's trial counsel was ineffective in the manner in which he did argue it. The trial record reflects that a substantial portion of counsel's closing argument was focused on the issue of premeditation. Moreover, trial counsel specifically argued that the number

1
2
3

of wounds inflicted on the victim was consistent with the loss of control, rather than premeditation. Considering the totality of the evidence before the jury, this Court finds no reasonable probability that the result of the trial would have been different but for the alleged deficiencies in trial counsel's premeditation argument.

4

(ME 1/5/98 at 11.)

5
6
7
8
9

This decision is not an unreasonable application of *Strickland*. Petitioner has shown neither deficient performance nor prejudice with respect to counsel's closing argument. In *Yarborough v. Gentry*, 540 U.S. 1 (2003) (per curiam), the Supreme Court, explaining that "[t]he right to effective assistance extends to closing arguments," discussed the application of *Strickland* to challenges to counsel's performance at closing:

10
11
12
13
14

[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. Judicial review of a defense attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas.

15
16

*Id.* at 5-6 (citations omitted); *see, e.g.*, *Hovey v. Ayers*, 458 F.3d 892, 906 (9th Cir. 2006).

17

Under this standard of review, Petitioner is not entitled to relief.

18
19
20
21
22
23
24
25
26
27

As the PCR court noted, counsel did argue that Petitioner acted without premeditation. After making arguments based upon reasonable doubt and an insanity defense (RT 12/14/92 at 74-79), counsel focused on the issue of premeditation. Referring to the trial court's jury instructions and the testimony regarding the argument between Petitioner and the victim, counsel argued that Petitioner's actions were "the effect of a sudden quarrel or heat of passion," preceded by the "provocation" of Ms. Katuran throwing a scissors at Petitioner. (RT 12/14/92 at 86.) Counsel then reiterated the evidence that Petitioner suffered from "psychological difficulties" and "instability" and was going through a "period of not eating, not sleeping, and stress"; without these conditions, counsel argued, "and had there not been a quarrel with provocation, this crime likely would not have happened. (*Id.* at 86-87.)

28

1

2        Counsel continued to recount Petitioner's background of child abuse and to detail the

3   particular stress he was under at the time of the murder. (*Id.* at 87-91.)  Counsel then

4   recounted Petitioner's history of mental problems, including incidents when he "lost control."

5   (*Id.*)  Counsel next, contrary to Petitioner's allegations, asked the jury to consider the

6   circumstances and nature of the crime:

7            You know how the crime was committed.  There was [sic] 40 some wounds
             on this lady's body.  Is that the kind of crime that's committed by someone
8            that's premeditated?  I submit to you that's the kind of a crime that's
             committed when somebody loses control, when they aren't able to think
9            clearly, when they aren't able to premeditate, and when a frenzy happens as
             a result of a quarrel or as a result of some provocation like scissors being
10           thrown.  That's what's reflected by the evidence.  That's what's reflected by
             the way this crime was committed.
11

12   (*Id.* at 91.)  Finally, counsel attacked the State's theory that Petitioner's actions after the

13   murder were consistent with premeditation, arguing that the only issue before the jury was

14   whether Petitioner "was able to premeditate on March the 11th, not what he was able to do

15   on the 12th, not what he was able to do in Montana at some later point." (*Id.* at 92.)

16        Petitioner's attack on counsel's performance amounts to a disagreement as to how best

17   to sharpen and clarify the defense argument on premeditation.  Counsel did not, as Petitioner

18   now advocates, specifically educate the jurors on the "period of reflection" element of

19   premeditation; however, "he could count on the judge's charge to remind them of that

20   requirement," *Yarborough v. Gentry*, 540 U.S. at 10, and the court did so instruct the jury

21   (RT 12/14/92 at 108-09).  Moreover, given the substantial effort counsel made in arguing that

22   the murder was a crime of passion or the result of a quarrel, together with the strong evidence

23   of premeditation cited by both the Arizona Supreme Court, *Gulbrandson*, 184 Ariz. at 64,

24   906 P.2d at 597, and the PCR court (ME 1/5/98 at 8), there is no reasonable probability that

25   the result of Petitioner's trial would have been different if counsel had presented an alternate

26   version of his closing argument.

27

28                                        - 41 -

For the reasons set forth above, the PCR's court's denial of Petitioner's guilt-stage IAC claims did not represent an unreasonable application of *Strickland*.  Therefore, Petitioner is not entitled to relief on Claim 12.

**Claim 13:    Ineffective Assistance of Counsel (Sentencing Stage)**

Petitioner alleges that he was denied his right to the effective assistance of counsel at sentencing because counsel failed to provide defense expert Dr. Blinder with Petitioner's complete medical records (Dkt. 62 at 54-61) and failed to present Dr. Blinder's testimony at the presentence hearing (*id.* at 61-62).[18]   According to Petitioner, Dr. Blinder's opinions, properly presented, would have rebutted the "heinous and depraved" aggravator (Claim 12(G)) and provided persuasive mitigating evidence.

Background

Prior to sentencing, the State noticed one aggravating factor, that Petitioner had committed the murder in an especially heinous or depraved manner under A.R.S. § 13-703(F)(6).   (ROA 110.)   Defense counsel prepared a notice listing eight mitigating circumstances to be proved at the presentence hearing.[19]  (ROA 118.)  At the presentence

---

[18]    With respect to the former claim, while Respondents conceded that it was exhausted, and the Court so found, it is clear that a specific IAC claim regarding the medical records was not raised in state court (ROA-PCR 256 at 23-25); nor did Petitioner raise the claim in his habeas petition, where he simply alleged that counsel's effort to rebut the "heinous or depraved" aggravating factor constituted IAC because counsel "failed to submit to the trial court Dr. Blinder's studied opinions." (Dkt. 27 at 68.)  It is only in his brief on the merits that Petitioner adds the allegation that counsel performed ineffectively by failing to provide Dr. Blinder with all of Petitioner's medical records.  (Dkt. 62 at 58-61.)  Therefore, the Court will not evaluate the allegation based on counsel's failure to provide records as a separate and independent IAC claim, but rather will consider the issue to the extent that it is relevant to the Court's evaluation of Petitioner's claim that counsel was ineffective in his presentation of Dr. Blinder's opinions at sentencing.

[19]    Counsel noticed the following mitigating factors: Petitioner's capacity to conform his conduct was impaired by reason of mental illness; unusual stress, personal and business; character and behavior disorders; a difficult early and home life; good behavior

hearing, counsel provided the court with the reports of Drs. Blinder and Scialli.  The State called for testimony from Dr. Don.  (RT 2/5/93 at 52-71.)  As noted above, Dr. Don had not had access to Petitioner's medical records when he performed his evaluation and testified at trial.  By the time of the presentence hearing, however, he had reviewed Petitioner's records.  (*Id.* at 54.)  Those records indicated that Petitioner had been diagnosed in the past with "antisocial personalty disorder," "sociopathic personality with poor impulse control," and "possibly . . . a Bipolar affective disorder."  (*Id.* at 55.)  Dr. Don testified that there was nothing in his review of the records that would change the opinion he had offered at trial.  (*Id.* at 54.)  After the hearing, defense counsel prepared a sentencing memorandum challenging the "heinous or depraved" factor and supporting the asserted mitigating circumstances.  (ROA 123-123c.)

In sentencing Petitioner, the trial court found that the "heinous or depraved" aggravating factor had been proved.  (ME 2/16/93 at 2-3.)  The court specifically found that Petitioner relished the murder, that he inflicted gratuitous violence, and that the victim was helpless.  (*Id.* at 3.)  This finding was based primarily upon the evidence that Ms. Katuran was the victim of "a brutally savage attack of shocking proportions," evidence which included the number, severity, and variety of the injuries and the fact that the victim had been bound with electrical cord, indicating that she was alive during at least part of the attack.  (*Id.* at 2.)  With respect to mitigating circumstances, the trial court found that Petitioner failed to prove by a preponderance of the evidence that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution, under A.R.S. § 13-703(G)(1).  (*Id.* at 3.)  The court found that, while Petitioner did not assert or prove that he was under substantial "duress" at the time of the murder, *see* § 13-703(G)(2), he had proved

---

while incarcerated; ability to be rehabilitated in an institutional setting; and close family ties.  (ROA 118.)

that "he was under unusual stress." (*Id.* at 3-4.)  The court also found several non-statutory mitigating circumstances, including the fact that Petitioner suffered from "character and behavior disorders," experienced "difficult early years and home life, including years of physical and mental abuse by his father," and demonstrated "good behavior while incarcerated." (*Id.* at 4.)  The court concluded, however, that these mitigating circumstances were not sufficiently substantial to call for leniency, and sentenced Petitioner to death.  (*Id.* at 5.)

The PCR court denied Petitioner's sentencing-stage IAC claim:

> While it is true that Defendant's counsel did not call Doctor Blinder to testify at the aggravation/mitigation hearing, the trial court heard his testimony at trial, and as specifically stated in A.R.S. § 13-703(C), Defendant's counsel had no duty to present it again.  Additionally, it must be noted that, contrary to Defendant's claim, his counsel did submit Doctor Blinder's written report to the trial court at the aggravation/mitigation hearing.  Additionally, it should be observed that at the time of trial, defense counsel was under the impression Doctor Blinder was unwilling to render opinions other than those that he testified to at trial, and which were contained in his written report.  Although Doctor Blinder's opinions may now differ from those he rendered at trial, his counsel's failure to illicit [sic] these opinions, of which he was unaware of [sic], at the aggravation/mitigation hearing, does not constitute ineffective assistance of counsel.

(ME 1/5/98 at 9.)

Analysis

The right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)).  With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695.  In *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." 539 U.S. at 534.  The

"totality of the available evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

The clearly-established federal law governing this claim includes the Supreme Court's decision in *Bell v. Cone*.  In *Cone*, a jury convicted the defendant of murdering an elderly couple and sentenced him to death after a hearing in which defense counsel presented no witnesses and made no closing argument.  535 U.S. at 691.  Instead, counsel cross-examined the prosecution's witnesses and directed the jury's attention to mitigation evidence that had already been presented in the guilt phase of the trial, including the defendant's drug addiction, mental problems, and remorse.  *Id.*  After noting the deferential standards set forth in the AEDPA and required by its own precedent, the Supreme Court explained that for Cone's claim to succeed,

> he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.  Rather, he must show that [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id.* at 698-99 (citation omitted).  The Court found that Cone could not make such a showing. *Id.* at 699.  The holding in *Cone* compels this Court to reach the same result with respect to Petitioner's claim.

Like Petitioner's trial counsel, Cone's attorney "was faced with the formidable task of defending a client who had committed a horribly brutal and senseless crime." *Id.*  Like Petitioner's counsel, Cone's attorney presented an insanity defense at the guilt stage of the trial, so that "he was able to put before the jury extensive testimony about what he believed to be the most compelling mitigation evidence in the case," including evidence about his client's background and mental health history, and their effects on him at the time of the crimes.  *Id.*  Like Petitioner's counsel, at sentencing Cone's attorney offered an argument

based on "mental disturbance" at the time of the crime. *Id.* at 691; *see id.* at 699-700. Finally, like Petitioner, Cone claimed that counsel was ineffective "for not recalling his medical experts during the sentencing hearing." *Id.* at 699. The Supreme Court found tactical support for counsel's decisions, explaining that "counsel reasonably could have concluded that the substance of [the experts'] testimony was still fresh to the jury." *Id.*

It is clear from the trial court's ruling that in considering mitigating circumstances the court took into account Petitioner's mental health history as well as the particular stressors than affected him at the time of the murder. The court had before it all of the mental health evidence, including the testimony and written reports of Drs. Blinder, Don, and Scialli, the latter two of whom had reviewed all of Petitioner's medical records. Through this evidence the court was presented with a detailed picture of Petitioner's state of mind at the time of the offenses, including his ability to premeditate the murder of Ms. Katuran and his capacity to conform his conduct to the requirements of the law. Therefore, as the jury did in *Cone*, the trial court had before it the information it needed to assess Petitioner's claim that, while not legally insane, he was affected by factors that compromised his mental condition at the time of the crimes to a degree warranting consideration as a mitigating factor. The court also had before it the trial testimony of family members detailing Petitioner's history of mental health treatment and the abuse suffered at the hands of his father. Because he had already presented such information to the trial court, counsel was not derelict in failing to present it again, or in another form, to the same judge at sentencing. Moreover, even if counsel's performance at the sentencing phase were to be characterized as deficient, the fact that the sentencer already possessed the information, and, as the trial judge, was in a position to evaluate it and apply it to the "heinous and depraved" aggravating and the (G)(1) mitigating factor, as well as to the nonstatutory factors asserted by defense counsel, indicates that Petitioner was not prejudiced by counsel's failure to re-offer the same information at sentencing. In addition, if Dr. Blinder had testified at sentencing, he would have been subject to cross-examination;

any differences in his testimony at sentencing and his trial testimony would have called his credibility into question.

Petitioner also criticizes counsel for raising "stress" as a mitigating circumstance rather than the statutory mitigating factor "unusual or substantial duress." (Dkt. 62 at 56.) However, the "duress" mitigator requires a showing that "one person . . . coerce[d] or induce[d] another person to do something against his will." *State v. Clabourne*, 194 Ariz. 379, 386, 983 P.2d 748, 755 (1999); *see State v. Brewer*, 170 Ariz. 486, 506, 826 P.2d 783, 803 (1992) ("personality disorders or impulse control problems do not fall within the meaning of duress under § 13-703(G)(2)"). Therefore, the (G)(2) factor was inapplicable to Petitioner's offense and counsel's failure to assert it was not unreasonable.

Finally, with respect to the contention that counsel performed deficiently by failing to provide Dr. Blinder with all of Petitioner's treatment records, the Court finds that Petitioner has not established that he was prejudiced by this aspect of counsel's sentencing-stage performance. Nothing in the record before this Court demonstrates that access to the complete records of Petitioner's prior treatments would have altered Dr. Blinder's opinion regarding Petitioner's mental condition, let alone that there was a reasonable probability that Dr. Blinder's revised opinion would have affected the court's sentencing determination.

The PCR court's decision rejecting Petitioner's claim of ineffective assistance of counsel at the sentencing stage did not involve an unreasonable application of clearly established federal law. Therefore, Petitioner is not entitled to relief on this claim.

**Claim 18:**    **Lack of Proportionality Review**

**Claim 21:**    **Death Penalty Statute Fails to Channel Sentencer's Discretion**

**Claim 22:**    **Death Penalty Statute Fails to Guide Prosecutor's Discretion**

**Claim 23:**    **Death Penalty Constitutes Cruel and Unusual Punishment**

**Claim 25:**    **Impermissible Presumption of Death**

**Claim 26:**    **Lack of Jury Determination of Sentence**

Petitioner raises a variety of challenges to the constitutionality of Arizona's death penalty scheme. He asserts that his death sentence is disproportionate to the penalty imposed in similar cases, in violation of his due process and Eighth Amendment rights; that Arizona's death penalty statute fails to adequately channel the sentencer's discretion, in violation of his rights under the Eighth Amendment; that the lack of guidelines governing a prosecutor's decision to seek the death penalty renders Arizona's capital punishment statute unconstitutional in violation of his rights under the Eighth and Fourteenth Amendments; that the death penalty constitutes cruel and unusual punishment in violation of his rights under the Eighth Amendment; that the mandatory language of A.R.S. § 13-703 creates a presumption of death in violation of his rights under the Eighth Amendment; and that the lack of a jury determination of sentencing factors violated his right to equal protection under the Fifth and Fourteenth Amendments. (Dkt. 62 at 62-71.) These claims are baseless, and the Arizona Supreme Court's rejection of them, *Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605, was neither contrary to nor an unreasonable application of clearly established federal law.

As the Arizona Supreme Court noted, there is no federal constitutional right to proportionality review of a death sentence, *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43-44 (1984)), and the court itself discontinued the practice in 1992, *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992). *Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605. The Ninth Circuit has explained that the interest implicated by proportionality review – the "substantive right to be free from a disproportionate sentence" – is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja*, 97 F.3d at 1252.

Rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion. *See Lewis v. Jeffers,* 497 U.S. 764, 774-77

- 48 -

(1990); *Walton v. Arizona,* 497 U.S. 639, 649-56 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002); *Woratzeck v. Stewart,* 97 F.3d 329, 335 (9th Cir.1996).  The Ninth Circuit has also explicitly rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith v. Stewart,* 140 F.3d at 1272.

In *Smith,* the Ninth Circuit likewise disposed of the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." 140 F.3d at 1272; *see Gregg v. Georgia,* 428 U.S. 153, 199 (1976) (pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional); *Silagy v. Peters,* 905 F.2d 986, 993 (7th Cir.1990) (holding that the decision to seek the death penalty is made by a separate branch of the government and is therefore not a cognizable federal issue).

Clearly established federal law holds that the death penalty does not constitute cruel and unusual punishment. *Gregg*, 428 U.S. at 169; *see also Roper v. Simmons*, 543 U.S. 551, 568-69 (2005) (noting that the death penalty is constitutional when applied to a narrow category of crimes and offenders).

In *Walton,* the Supreme Court rejected the argument that "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution." 497 U.S. at 651. *Walton* also rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. *Id.* at 651-52 (citing *Blystone v. Pennsylvania,* 494 U.S. 299 (1990), and *Boyde v. California,* 494 U.S. 370 (1990)); *see Kansas v. Marsh,* --- U.S. ----, 126 S. Ct. 2516, 2524 (2006) (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith,* 140 F.3d at 1272

(summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute and its failure to apply the beyond-a-reasonable-doubt standard).

Finally, in *Ring v. Arizona*, 536 U.S. 584, 609 (2002), the Supreme Court found that Arizona's aggravating factors are an element of the offense of capital murder and therefore must be found by a jury. However, in *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Court held that *Ring* does not apply retroactively to cases already final on direct review. Because direct review of Petitioner's case was final prior to *Ring*, he is not entitled to federal habeas relief premised on that ruling.

Petitioner is not entitled to relief on Claims 18, 21, 22, 23, 25, and 26.

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims. The Court further finds that an evidentiary hearing in this matter is neither warranted nor required.[20]

## CERTIFICATE OF APPEALABILITY

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue. Therefore, in the event that Petitioner appeals, this Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has

---

[20]    The Court granted, in part, Petitioner's motion for discovery, authorizing the deposition of trial counsel Spillman and disclosure of the preliminary competency evaluation. (Dkt. 46 at 22-26.) Beyond general requests for an evidentiary hearing, Petitioner has not requested further evidentiary development of any specific factual issue. (*See* Dkts. 62 at 72, 80 at 41.) Furthermore, the Court concludes, after reviewing the record, that none of Petitioner's claims warrant evidentiary development because the allegations, if true, do not entitle Petitioner to habeas relief.

made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists, applying the deferential standard of review set forth in the AEDPA, which requires this Court to evaluate state court decisions in the light of clearly established federal law as determined by the United States Supreme Court, could not debate its resolution of the merits of Petitioner's claims as set forth in this Order. Further, for the reasons stated in the Court's Order regarding the procedural status of Petitioner's claims filed on August 30, 2000 (Dkt. 46), the Court declines to issue a COA with respect to any claims that were found to be procedurally barred.

Accordingly,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 27) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on November 10, 1998, is **VACATED.**

**IT IS FURTHER ORDERED DENYING** a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Noel Dessaint, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 31st day of March, 2007.

Stephen M. McNamee
United States District Judge